Department of Administrative Services, or arguments not to exceed 15 minutes per side. Ms. Knoll for the appellant. Good morning. Before we begin, I'd like to reserve four minutes of rebuttal time. Again, my name is Laira Knoll, and I represent the appellant in this case,  Noniko Carroll, and her claims and her appeal against the Ohio Department of Administrative Services. I'd like to address four issues today. First, the summary judgment standard, the cat's paw theory, adverse employment action, and then the similarly situated issue. First, the summary judgment standard I thought was said very well by Judge Stee, in one of your Washburn case, where you said that the facts must be viewed in a light most favorable to the non-moving party, and the facts must be viewed as a whole. And that's very important in this case, because you cannot look at it in a vacuum. In this case, Noniko Carroll was an exemplary employee. Not often do I get to come up here in front of any court and say, my client had not a blemish on their record, and she didn't until 2008. And at that time, she was accused of threatening to kill someone and thumping them on the head. And number one, she didn't threaten to kill anyone. She didn't use the profanity that was alleged. We are getting into semantics, but she tapped them on the head. Thumping is what makes it sound more violent. Now, the trial court turned this into an issue that not even the appellee went into and said this is a workplace violence issue, because that makes it worse. When anyone says workplace violence, we've got to take this seriously, that's not the case here. It wasn't a workplace violence. She wasn't accused of workplace violence. She was accused of conduct unbecoming, which she denies. Well, she ended up in the end with a 23-hour suspension, right? Yes. So it wasn't like she was fired or demoted. So isn't the issue here not what actually happened, that is, we're not the fact finder, but what the company's investigation and honest belief was? Isn't that really what we should look at? I mean, not to decide how hard the thump was. I agree, Your Honor, and my point in even bringing that up is that the trial court weighed the evidence, which was not the trial court's job to do, and the honest belief defense fits right in here because the trial court weighed the evidence. The trial court basically said, well, what Mr. Hooker really said, that's what really happened. It really happened, and that's what, at the time that this investigation went down, the particularized facts were, number one, she had an unblemished career. Everybody, no matter who it was, all says she was always concerned about the taxpayer. She was brilliant. Does that get you anywhere? People can be unblemished and still do something that merits a less than three-day suspension. Well, for this place, it didn't just stop at the three-day suspension, and three-day suspension is a lot. We do have two separate things. We have the suspension and then we have the reassignment. Which we will say is a demotion. Okay. I mean, you said that's your third point, at least as far as I'm concerned. I'll accept it as an adverse action. I don't know about my colleagues, but what I'm interested in is, number one, what evidence would you show for similarly situated under the suspension issue? And then what would you argue with respect to legitimate non-discriminatory reason with respect to both incidents, both actions? Okay. So similar situated and legitimate non-discriminatory reason. First of all, similarly situated, we have Mr. Thomas. Ms. Wozniak presented a lengthy affidavit saying, I went through two years of just complete bad stuff. And I told Ms. Schaefer about it, the person in charge of HR. And I told her about it. I told everybody about it. I told Bill Tickner about it. Nobody wanted to do anything about it. And so when finally she forced the issue, and actually she even went to Ms. Carroll, who went to Ms. Schaefer about it, and said, this is discrimination. And then what happened after that was they did an investigation of Mr. Thomas' subordinates, and they all said it was horseplay. They believed them. They do an DAS, and let's make clear, DAS did all the investigations here, all of them. DAS does an investigation of Ms. Carroll's subordinates. Her supervisor said, no, this didn't happen. These people are incompetent. They should be fired, and they're making it up. All her subordinates said, no, she doesn't act like that. She doesn't talk like that. And they discarded it all. And the court said, no, we don't believe that. The court weighed the evidence. Are you distinguishing the investigators from the decision makers? That is what you just told me. You're saying the investigators were the same people who did both investigations. Ms. Schaefer is everything bottlenecks at Ms. Schaefer. She's the head of HR. And so, yes, I'm saying that she was in charge of the investigations, and she's involved. And for all of both the reassignments, and are we focusing on the suspension? I'm saying that she is for both. Now, we're going to have ‑‑ there's going to be an issue of the word decision maker because of the disciplinary grid with the state. They're going to say they have said that it was Director Quill, and that's a different decision maker. But as actually Judge Boggs points out in the majority opinion in Bishop v. Ohio Department of Rehabilitation and Corrections in July of 2013, which, by the way, was a female alleging gender discrimination about a female. In that case, they called it the rubber stamp theory, and that's what is cat's paw synonymous with rubber stamp because that's what happened. But the decision maker was influenced. There was no independent investigation. There's absolutely not a hint of an independent investigation by Director Quill in the record because there wasn't one. And what happened was Ms. Schaefer handed Ms. Carroll's investigation to him, and she handed Mr. Thomas' investigation to whoever she handed it to. Your basic theory is that Schaefer is the person really doing the discriminating in both incidents? She's allowing it to continue. I'm saying that there's discrimination going on by the males, which is similar to the Bishop case. When the males became more emboldened by the fact that they were getting away with it in Bishop, and so Ms. and Ms. Schaefer didn't believe it happened, and quite frankly, she just got tired of hearing about it because Nonnie wasn't going to be quiet anymore. She was complaining. She was complaining in writing. Melissa Wozniak did the same thing about Mr. Thomas, and he actually did it. He was fired for having live sex chats online and leaving it on the server. He got a 20-day suspension. He should have been fired. Well, that's not the law as regards to similar conduct, similarly situated. Well, that is more egregious conduct. And he got more egregious punishment. He got 20 days against three days minus an hour. He did it, though. She didn't. And that's the problem with similarly situated, is we got, you know, she didn't do it. But then I'm forced to do an analysis where there's a person that has been accused of similarly situated behavior, even though she didn't do it. And I have to show that it was more egregious. Now, the other thing is, and more importantly here, is that Mr. Thomas comes back. He comes back to the exact same. But let's go back to what you just said about, well, she didn't do it. But what's the law on that? In this kind of an action, can you simply rely on my view is she didn't do it, somebody else's is that she did, without showing something to undermine the honest belief? Well, I mean, that's where we can. Isn't that what you have to focus on? Well, and that's the first part of the argument, that she didn't do it, and they knew it at the time. They were saying they didn't believe it, but they said Mr. Albright, who there's a big, Mr. Albright is a person who did a lot of the investigation with Ms. Schaefer very involved, and the very involved, intimately involved, I think was the wording, with the investigation. Which investigation? The one where Ms. Carroll was accused of threatening to kill Mr. Hooker and Mr. Smith. Was Mr. Albright also the investigator from DAS on the allegations made against Mr. Thomas? It was Ms. Schaefer. Ms. Schaefer was the investigator? She said that she arranged or did the investigation. I guess I don't know that there was another one. Not with DAS, is she? Yes, she's Human Resources. She's Human Resources for DAS, and she had complete control over the investigations, regardless of who, if there was an additional investigator.  So, but, and back. So Mr. Albright was not the investigator in both instances. He was in relation to your client, but not in relation to Mr. Thomas. Is that accurate? I don't know that there's any evidence in the record about who the name of the investigator was for Mr. Thomas, but Ms. Schaefer was, and there is evidence from Ms. Schaefer's own testimony that she did, that she was involved in that investigation as well, and that there was a meeting. Now, and back to the honest belief defense. Counsel, you can go on, but you'll be eating up your four minutes, so you can make your choice. I should wait, Your Honor. Thank you. You'll have your four minutes for rebuttal then. Good morning, Your Honors. May it please the Court, Drew Pearsall, Assistant Attorney General on behalf of the Appley, the Ohio Department of Administrative Services. Your Honors, this case involves two actions, a 23-hour suspension for which the appellant partially admits responsibility for the thump on the forehead, which formed the basis of her suspension, and also a reassignment with no change in working hours and no change in the appellant's $108,000 annual salary. As you can see from the district court's decision, there is no evidence of gender discrimination or retaliation here. Disagreement with decisions taken by an employer is not tantamount to discrimination or retaliation, which seems to be the appellant's theory in this case. Turning first to the suspension and touching on some of the issues that have already been raised by the panel, and although the district court did not reach this issue, you can see that the decision by the appellee to suspend the appellant for 23 hours is amply supported by the honest belief rule. The focus, of course, is not on whether or not the appellant proclaims innocence. The focus is on whether the appellee investigated and thoroughly researched the allegations. Your adversary seems to say that this Schaefer is the bad person in here. What's your view on Schaefer's role in each of the two investigations or each of the two incidents? Yes, Your Honor. Allison Schaefer testified, and actually the testimony on this issue has been consistent. Gary Albright is the EEO investigator for the Ohio Department of Administrative Services. He conducted the initial fact-finding investigation into the allegations made by Mr. Hooker against Ms. Carroll. Ms. Schaefer, and he found his job was to determine whether or not he should proceed to the disciplinary level. He does not impose discipline or recommend discipline. Ms. Schaefer, as the head of HR, oversaw the investigation and is Mr. Albright's boss. And I should also point out that if you take a look at the brief I filed in this matter, Mr. Albright testified explicitly that he took into account whether or not Mr. Hooker concocted these allegations against Ms. Carroll in order to save his job. Ms. Schaefer explicitly testified to the same thing. Ms. Schaefer testified, we took that into account. Did we think that she was really going to kill anyone? No, we didn't, but nonetheless the statement was made, and that's wholly inappropriate in the workplace. Thirdly, if you take a look at the predisciplinary hearing officer's report, that's an individual by the name of Darren Shulman. He conducted the predisciplinary investigation. If you take a look at his report... You said investigation earlier, you said hearing, which... I'm sorry, if you take a look at his hearing report, I apologize, Your Honor, it conducts an extensive analysis weighing the credibility of Ms. Carroll, weighing the credibility of Mr. Smith, who was a witness to this incident, weighing the credibility of Mr. Hooker. So you actually have a hearing and you have Shulman's written decision. Exactly, and Schaefer plays no part in that. That's an independent decision reached by an independent person. He has no affiliation with anyone in the process. Well, he is a state employee in this department. Well, fair enough. He's an employee of the appellate, but separate from the players here. Then, Allison Schaefer was very clear. Director Quill makes an independent decision in every case. He takes a look at the allegations, the packet, all the materials, the investigations, the predisciplinary hearing officer's report, and makes an independent decision. This is not a rubber stamp. Allison Schaefer was clear on that point. Turning to the reassignment... Quill deposed or gave an affidavit or anything? He was not, Your Honor. Okay. All right, so now you're going to tell us about the Thomas investigation? That's correct, Your Honor. The Thomas investigation, Allison Schaefer testified that she initiated the investigation, and after uncovering some evidence, that investigation, Ms. Wozniak lodged a complaint with the state of Ohio. Are you saying that Schaefer initiated the investigation before she heard from Wozniak? Wozniak, allegations from Wozniak came, and actually I believe it came through Ms. Carroll. Somehow they came to Ms. Schaefer's attention. I believe Ms. Wozniak told the appellate. Okay, so she didn't just wake up one morning and decide to investigate Thomas. I don't think so. And then after she uncovered, I believe her quote was, some evidence, something was going on here. There was a complaint lodged by Ms. Wozniak with the state of Ohio watchdog, this is the name of their website, it's the State Inspector General's Office, who conducts tons of administrative investigations into potential wrongdoing at state of Ohio agencies. It was an independent third party, completely disassociated from the Ohio Department of Administrative Services, that made the finding, made a clear finding, that the allegations by Ms. Wozniak against Mr. Thomas, they described it as nothing more than office horseplay, was the quote, and they said that he engaged, explicitly found that he engaged in no wrongdoing. And that was people that were not associated even with DAS? Not associated with DAS, they function, the Ohio Inspector General enjoys great autonomy, and I can assure you that they routinely issue decisions critical of the state and have no interest in issuing a flowery opinion supporting state activities. But then as a result of everybody poking around, I take it, then they found Thomas' sexual activities on the computer? That's correct, and he didn't dispute engaging in that, obviously that's something you shouldn't be doing at work, and he received a discipline, which is the maximum discipline permissible under the grid, the last step before termination. He had an unblemished record before this sex chat matter was uncovered. We've spent most of our time on the suspension, unless my colleagues have any questions, do you want to say? I'd like to hear about the reassignment. The reassignment. Of course. It sounds a little bit like all this other stuff was going on with the suspension and other tensions in the office, and so then they just decide to give her a lesser job to deal with that. Is that what's going on? No, what is going on is Andrew Sherr came in as the Chief Information Officer for the Office of Information Technology within DAS. He brought with him, and this is clear, everyone's testified to this, he brought with him this concept of ITIL, which is Information Technology Infrastructure Library. He brought that idea and concept with him. He wanted to implement it at DAS. As a high-level officer, that's certainly his prerogative. He had been at DAS only a few months. When he arrived, I believe Ms. Carroll was still on administrative leave as a result of the allegations in the pending investigation. He inherited what he described as a troubled team that Ms. Carroll led, and I don't think there's, if you take a look at the record, I don't think there's any dispute that he inherited a team that was a troubled team. He articulated three reasons for this action, for this reassignment. He wanted to correct, he wanted to address the dissension within the team that Ms. Carroll led. He had the need to fill two email engineer positions in another department, and he wanted to put a manager in the ITIL position that he brought with him to the agency. Importantly, as this court well knows, lateral transfers ordinarily are not adverse employment actions unless there's something other than a change in work hours, which was not a change here. There was no change in pay here. You're talking about for Title VII purposes or for retaliation purposes? Well. Or for discrimination? I mean, the test is different for retaliation, isn't it? Obviously, under Burlington, the test for an adverse employment action is slightly different. It is a lower standard. I all concede that, of course. And it might be a different outcome depending on. You certainly have a retaliation where if you're retaliating, you give them a job where they have a lot less responsibility, but just give them the same pay. I mean, that. Well, I understand your point, but I would then come back with that, is that it's crystal clear here that Andrew Scherr was the decision maker with respect to the reassignment, and he explicitly testified. He was new to the agency. He had no knowledge of Ms. Carroll's prior complaints of discrimination and retaliation. That is black-letter Sixth Circuit case law, that if the decision maker, the relevant decision maker, not merely some agent of the defendant, must possess knowledge of the plaintiff's protected activity. Scherr testified he had no knowledge. So he knew that there was a troubled whatever it was? Well, he knew there was a troubled team, but that's certainly not the same thing. He didn't know what the trouble was? He knew he had a troubled, but he didn't know what the trouble was? Well, no. The trouble was thumping an employee on the forehead and threatening to kill them. The trouble was not discrimination. Well, wait a minute. Wait a minute. Did he know about? I thought you were going to say that the trouble was there was dissension amongst these people, but what the source of that dissension was was not known to him, or is that wrong? That is, he knew about the previous suspension and the previous incident? When he came on board, the suspension had not been issued yet. When he came on board, I believe Ms. Carroll was on administrative leave and the discipline was forthcoming. He didn't know of the appellant's protected activity. He did not. He testified to that. Ms. Carroll said. . . Of the protected activity. And, of course, the incident itself wouldn't have been protected activity. Of course not. No. It's not protected. It's not a complaint of discrimination or retaliation. Although she complained about the investigation itself, did she not at some point? She complained that the investigation itself was discriminatory. She did, but not to Mr. Scher, to Ms. Schaefer. And, again, Ms. Schaefer, her role is not as the appellant would have it seem in this whole scenario. If you take a look at the Sixth Circuit case law, if he possessed no knowledge. . . He testified. . . The first time I had knowledge that Ms. Carroll was complaining of retaliation or discrimination is when she sent an email out announcing a lawsuit she had filed in the Ohio Court of Claims about two months after her reassignment. After the reassignment. After her reassignment. He said, that's the first time I've ever heard of Nonnie Carroll complaining of discrimination or retaliation is when she sent this email out to high-level people within DAS announcing a lawsuit she had filed and promising to file a federal lawsuit. He said, that's the first time I heard of it. The same person who recommended the appellant for the ITIL position, an individual by the name of Stuart Davis, testified to the exact same thing. He said, I worked in a different . . . Okay, but to sort of go back, if we're talking about pretext, I guess you would argue that if it was a pretext . . . Well, it's not even a pretext because he says he was trying to solve the trouble as well as to fill his organization chart, right? Correct. It wasn't purely to make the organization chart come out the way he wanted. Well, I mean, he had some reasons, or says he does, to do that, but he also took into account that it would potentially solve some of the interpersonal problems. Is that fair? I think that's fair. But, of course, solving interpersonal problems, as the district court clearly found, is a perfectly acceptable way of handling interpersonal problems. You essentially separate the parties. And the fact that, and the district court was clear, I think it said this on a couple of different occasions, that while the appellant may disagree with the manner in which the appellee handled the situation, nonetheless, they had legitimate business reasons for making the decisions that they did. And, thus, it's not discrimination or retaliation. Again, I would point to the record is overflowing with evidence that, clearly, this team was a troubled one. It's not going particularly well. Let me just take you back to one factual question. After this hearing by, what's his name, Truelman? Truelman. Did he make a recommendation or a finding? He made a recommendation that there was just cause for discipline. Of any particular discipline? I believe, if you take a look at his report, underneath the box where he signs his name, it says three days. Three days. And then they reduced it so as not to rise to the level of an appealable. That's true. Okay. But he recommended three days. It's right next to his name on the form. Absolutely. Sorry. No, that's okay. I didn't mean to distract you. No, the investigations in this matter are essential. But I think, as you can see, when the inspector general becomes involved, it's hard to attribute any sort of animus to the department when you have an independent third party conducting the investigation. Touching briefly on the cat spot theory, because this is how the appellant is attempting to bridge the gap between these different decision makers, again, they've identified Allison Schaefer, although she was named in the district court briefing, but it was not fully developed below. But the fact that Ms. Schaefer, as a 30-year employee of DAS, did not feel she had been discriminated against on the basis of her gender does not mean that she's dubious of any and all complaints of gender discrimination lodged by females. That's an extrapolation that's not supported by the record. She never testified that she was dubious of complaints of gender discrimination by other females. She just felt as though she had never been discriminated against. If you take a look, for instance, she can't serve as the cat's paw in this theory for the simple reason that she did not possess the requisite discriminatory animus of anti-female. For instance, as you would see in Staub v. Proctor Hospital, which is the Supreme Court case issued in 2011 that sort of clarified and crystallized the cat's paw theory. There, that was a USERA case, and the anti-military animus in that case was overwhelming. You had instances in which the two supervisors who served as the cat's paws were making anti-military comments, were saying that the individual, the plaintiff, was taking all sorts of leave to attend to reservist duties, and the summer camp is a big joke and a waste of taxpayer money. They would shift schedules around to get at this plaintiff. We don't have this here. Allison Schaefer does not possess a discriminatory animus. I think your time's concluded unless my colleagues have any other questions. Okay, thank you. Thank you, Your Honors. You have four minutes for rebuttal. We just can't leave common sense at the door here. To say that women don't discriminate against women is ridiculous. They're the worst, as a matter of fact. I can say that. I'm a woman. I know. We can't say that. It's not PC. That's right. But come on. The issue here, they have all these investigations that all are based on DAS investigations. The IG report adopted investigative findings of DAS. Allison Schaefer said that. We specifically cited her testimony in our brief. Allison Schaefer said that she did the investigation. The state always does this. They have this big web and all these mirrors and smoke, and they change it as they go through, and that's how they get through their own rules. And if we allow that to happen in this case, we've got, number one, DAS is just going to continue to be riddled with gender discrimination because Allison Schaefer said, hey, I never felt like any of the women that complained were discriminated against based on gender. But importantly here, I want to make two quick points, and that is, number one, Ms. Carroll's own supervisor, Mr. Pennington, said when he came on everybody talked bad about her and everybody told her all these things that she was a challenge and how she did this and she did that. And they had to come to Jesus Meeting, Ms. Carroll and Mr. Pennington, for three hours, and they worked it out. And he's like, because Ms. Carroll's not saying, I'm right, I'm right, I'm right. Ms. Carroll's saying, work with me here, nobody will listen to me. And that's what that email was to Cher. And it was two months after, but Cher knew about it. Cher knew about everything because all the men talked. All the men talked. And in the Bishop case that I cited earlier that you were on the panel for, Judge Boggs, it said, although in most Title VII retaliation cases, the employee will be able to produce direct evidence that the decision-making officials will not be able to. No, the protected activity. Direct evidence is not required. But based on what Pennington said when he came in, his supervisor, her supervisor, based on the fact that Pennington said, I tried numerous times to tell Cher that she was not a bad person as soon as he came on, and he gave him the hand. He gave him the hand. He didn't want to hear about it because he had been told. And then they all sit down, and lo and behold, it comes to them to put Nonnie Carroll into this hole of a position so that it will take care of the dissension. You talk about yourself saying all the men talked. Did they talk about we're against her because she's a woman or we have bad feelings about her because she's a problem? Is there testimony, depositions, or whatever? What are you relying on when you say all the men talked? Mr. Pennington's testimony. And in the Dobson v. Daimler-Chrysler case. Let's stick to Pennington. Tell me exactly what Pennington says where I should look for it in the record. It is cited in our brief that Pennington said that had she been a man, it came everything whether it was decision-making for her position or if she was actually a productive piece of DAS in that position as a manager. Whether it was getting a stapler or an employee or whatever, it was always a problem. She had to jump for more hoops to get what she needed or get her job done than the men did. And that she said, Ms. Carroll, you know where you stand with her.  I think sometimes it might be a bad thing, but I joke on that. She says what's on her mind. She says it respectfully, though, and the men didn't want to hear it. And Mr. Pennington said it. He said that this was retaliation. He said he was retaliated against for standing up to it. He wrote in his email, I'm getting this bad evaluation because I stood up and I will not continue this discrimination and harassment against my best manager. She wasn't just a manager. She was his best manager, and he was mad that they took her and put her in ITIL. Now they keep saying, well, she's getting a $108,000 salary. And Pennington is where? One level down from Schur? Stu Davis was his boss at the time, one of the people he talked to. Stu Davis moved up, and Andrew Schur kind of moved in. So Schur became his boss. Pennington reports to Schur now. He did, no. At the relevant time. Schur left. At the relevant time, Pennington is one level down from Schur and apparently has a different view of certain things than Schur does. Well, yeah, because he works with her every day. He's there. He knows what's going on. All the people do, and Schur has only been listening to everybody else, including Ms. Schafer. All these extraneous reports. I don't think your time's expired. May I just conclude, Your Honor, by saying that there's so much weighing the evidence, the credibility a reasonable jury could find, not even that Ms. Carroll did not commit these things, that DAS is not telling the truth, and the reason they're not telling the truth is to cover up discrimination and retaliation. Thank you, Your Honor. Thank you, counsel.